Edward M. Cramp (SBN 212490)
EMCramp@duanemorris.com
Karen L. Alexander (SBN 265926)
KLAlexander@duanemorris.com
Ayad Mathews (SBN 339785)
AMathews@duanemorris.com
**DUANE MORRIS LLP**
750 B Street, Suite 2900
San Diego, California 92101
Telephone: +1 619 744 2200
Facsimile:  +1 619 744 2201

Attorneys for Plaintiff
CALIFORNIA ASSOCIATION OF
PRIVATE POSTSECONDARY SCHOOLS

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS, a California non-profit mutual benefit corporation, <br><br> Plaintiff, <br><br> v. <br><br> KHALIL MOHSENI, in his official capacity as Commissioner of the California Department of Financial Protection and Innovation, <br><br> Defendant. | Case No. <br><br> **COMPLAINT** |

**INTRODUCTION**

1.      This case challenges newly issued California regulations that penalize one set of speakers while amplifying another in a vital marketplace of ideas: postsecondary education. These regulations prohibit *some* institutions from enrolling students unless the institutions register with, pay fees to, and receive approval from a state department that is tasked with overseeing financial institutions, not classrooms—but specifically exempt *other* institutions, a distinction that is believed and alleged to be rooted in an improper regulatory preference for one type of educator over another.

2.      Plaintiff, the California Association of Private Postsecondary Schools ("CAPPS"), brings this action to vindicate its members' First Amendment rights against a regime that conditions speech on prior governmental approval and discriminates based on the identity and viewpoint of the speaker.

3.      Acting under the California Consumer Financial Protection Law, the Department of Financial Protection and Innovation ("Department") adopted a rule that forbids proprietary postsecondary institutions from providing "education financing" to students unless and until they first register with and pay fees to the Department's Commissioner, the Defendant in this action. At the same time, the Department created a categorical exemption for public and private non-profit postsecondary institutions who are no differently situated than proprietary institutions. The result is a content- and speaker-based system of prior restraint: proprietary institutions such as CAPPS members must overcome a regulatory hurdle before engaging in protected First Amendment expression, while their public and non-profit peers need not.

4.      The First Amendment does not tolerate such favoritism. CAPPS and its members exist to provide education and career training for thousands of Californians— many of whom are women, people of color, working adults, and other historically marginalized groups who rely on flexible, career-focused programs. California already subjects private postsecondary institutions to a comprehensive, consumer-protective oversight framework under the Private Postsecondary Education Act, and federal law

imposes robust disclosure and fairness requirements on institutional lending. Yet the Department's rule singles out private for-profit institutions for censorship, burdening their protected speech and extracting nonrefundable fees, while exempting hundreds of similarly situated public and non-profit institutions—undercutting the Department's consumer-protection rationale.

5.     Because the rule regulates speech based on its content and the speaker's identity, and because it imposes a prior restraint that is neither necessary nor narrowly tailored to any legitimate interest, it is unconstitutional.

6.     CAPPS seeks declaratory and injunctive relief to prevent ongoing and imminent violations of its members' First and Fourteenth Amendment rights and to restore a level playing field in which all postsecondary institutions may lawfully enroll students and help finance their education without undue regulatory hurdles or costs.

## PARTIES

**CAPPS is the voice for private postsecondary schools and their students.**

7.     CAPPS is a California non-profit mutual benefit corporation whose central mission is to serve the private postsecondary sector—the most diverse sector of higher education in the State.

8.     For more than two decades, CAPPS has worked with the California Governors, Legislature, elected officials, and many regulatory agencies to advocate for the interests of the proprietary postsecondary sector and its student population.

9.     Since its founding, CAPPS has welcomed up to 300 postsecondary institutions as members, including private for-profit and religious-exempt organizations.

10.     CAPPS has standing to bring this action on behalf of its members. Various CAPPS members are, and will be, adversely affected by the regulatory action challenged in this lawsuit. The ability to help students finance their education is essential to the operations of many of CAPPS' members. Moreover, and as explained in detail below, CAPPS members are already subject to laws that compel them to

include certain financial disclosures in every student enrollment agreement. Every enrollment agreement containing these mandatory financial disclosures is arguably an instrument of "education financing" as defined by the Department's regulation, meaning that CAPPS members who wish to continue enrolling students have no choice but to register. Numerous CAPPS members have already reluctantly made the decision to submit to the Department's onerous registration process and pay nonrefundable fees under the new regulation in order to continue to enroll students and provide students with education financing. These schools will need to continue to remain registered with the Department and continue to pay additional fees each year that this challenged regulation remains in effect. On information and belief, other CAPPS members have been unwilling or unable to comply with the Department's draconian registration requirement and now must either stop enrolling students altogether or risk penalties and sanctions from the Department.

11.     The Department's action places an unconstitutional burden on the ability of CAPPS members to engage in protected expression by providing education to their students, while exempting public and private non-profit institutions from the same regulatory burden. The end result is a violation of the First Amendment: a regulation that favors one type of postsecondary institution over another and favors the expression of public and private non-profit institutions over that of private for-profit institutions.

12.     By this lawsuit, CAPPS seeks to protect the First Amendment rights of its members against unconstitutional regulatory action by the Department and its Commissioner. The First Amendment is not only germane to CAPPS' purpose—it is fundamental. CAPPS exists to exercise protected rights of speech, association, and petition on behalf of private postsecondary schools. Its core activities include advocating before lawmakers and regulators, engaging in political speech through its political action committee, publishing information for its members, and uniting institutions to pursue shared policy—forms of expression and collective action safeguarded by the First Amendment.

4
**COMPLAINT**

**The Commissioner is a defendant because he oversees and enforces the Department's regulations, including the rules challenged in this action.**

13.    Defendant is the Commissioner of the Department.

14.    Governor Gavin Newsom appointed Defendant as the Department's Commissioner on February 7, 2025.

15.    The Commissioner's responsibilities include the promulgation, oversight, and enforcement of regulations adopted by the Department, including those regulations that are issued pursuant to the California Consumer Financial Protection Law, Cal. Fin. Code §§ 90000, et seq. ("CCFPL").

16.    CAPPS sues Defendant only in his official capacity as Commissioner.

## JURISDICTION AND VENUE

17.    This civil action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. § 2201 to vindicate the civil rights of numerous private for-profit postsecondary institutions who have been—and are being—subjected by Defendant to unconstitutional rules that restrict and burden their fundamental right to free speech in violation of the First and Fourteenth Amendments. This Court has original jurisdiction under 28 U.S.C. § 1331.

18.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because Defendant, as Commissioner of the Department, performs his primary official duties, including enforcement of regulations issued pursuant to the CCFPL, at the Department's main office in Sacramento, and is therefore a resident of this district.

19.    Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district, including the Department's announcement, drafting, issuance, and enforcement of the challenged regulations, and because various CAPPS members whose speech rights are being abridged are located in Sacramento.

/ / /

/ / /

## DIVISIONAL ASSIGNMENT

20.    Because a substantial part of the events and omissions giving rise to this action occurred in Sacramento, this civil action is properly commenced in the Sacramento Division of the United States District Court for the Eastern District of California. *See* L.R. 120(d).

## FACTUAL BACKGROUND

**CAPPS members offer vocational and career-oriented programs across California to thousands of historically marginalized individuals.**

21.    For nearly a century, for-profit postsecondary institutions—including many CAPPS members—have offered career-focused educational programs that equip students with practical skills and open doors to meaningful, long-term opportunities across the United States.

22.    In California, CAPPS members offer vocational, career-oriented programs that prepare students for work in industries including healthcare, finance, technology, cosmetology, massage therapy, and HVAC, to name a few.

23.    The members' student populations are demographically and economically diverse, often consisting overwhelmingly of women, persons of color, and other historically disadvantaged groups that have faced long-standing barriers to opportunity.

24.    Because many students do not come from economically privileged backgrounds, they often lack the time and resources to pursue traditional long-term degree programs. They turn to CAPPS member schools because these institutions offer focused training at a faster pace, frequently without the cost of general education courses unrelated to occupational goals. Indeed, some programs can be completed in as little as nine months, allowing graduates to improve their earnings shortly after completion.

25.    CAPPS members also provide flexibility, offering day and evening classes and, when appropriate, remote instruction—critical for many students, including single parents, who must balance education with employment and family

responsibilities.

26.    In sum, the programs offered by CAPPS members give thousands of Californians—many of whom are equity-challenged—the marketable skills needed to compete in today's economy. The challenged regulations threaten and burden these students' educational expression by prohibiting proprietary institutions from offering the education financing that many of these students need to pursue their education unless and until the institutions register with, and are approved by, the Commissioner.

**Postsecondary institutions—regardless of their economic model—offer financing to their students, which the students use to cover the cost of attendance and to engage in protected First Amendment expression.**

27.    Over the last two decades, the cost of postsecondary education has significantly increased across the Nation, and California is no exception.

28.    Many students—whether recent high school graduates or older adult learners—pursuing higher education in California typically cannot afford to pay for programs out-of-pocket. Instead, many postsecondary students rely heavily on financial aid to cover their cost of attendance, ranging from tuition, fees, books and supplies to room and board and transportation.

29.    For instance, according to the Integrated Postsecondary Education Data System (IPEDS), 79 percent of full-time, first-time students received financial aid in California in 2022–2023. The percentages are generally similar across institutional sectors: public four-year or above, private non-profit four-year or above, private for-profit four-year or above, public two-year, private non-profit two-year, and private for-profit two-year.

| Sector type | Public, 4-year or above | Private non-profit, 4-year or above | Private for-profit, 4-year or above | Public, 2-year | Private non-profit, 2-year | Private for-profit, 2-year |
|---|---|---|---|---|---|---|
| Percentage of aid | 75.4% | 87.3% | 81.7% | 79.3% | 88.3% | 87.4% |

30.    The bulk of education financing occurs at public postsecondary institutions. IPEDS data show that in 2022–2023, 240,757 full-time, first-time students in California received financial aid, approximately 70 percent of whom attended public institutions. Private for-profit students accounted for approximately only 18 percent of the overall financial aid.

31.    Various types of financial aid are available to students to help them pay for postsecondary education. The aid includes scholarships, grants, and loans.

32.    Scholarships are typically awarded to students based on criteria established by the institutions. Scholarships can be merit-based (e.g., awarded based on a student's academic performance), need-based (e.g., awarded based on a student's financial condition), talent-based (e.g., awarded based on a student's specific set of skills), or identity-based (e.g., awarded to a first-generation college student). The amount of a scholarship awarded is typically applied to cover a student's cost of attendance. So long as a student meets and maintains the eligibility criteria for a particular scholarship, the student does not need to repay the amounts awarded.

33.    Grants are another form of free aid that is typically provided by the federal government, state governments, and, at times, the institutions themselves.

34.    The U.S. Department of Education offers a variety of federal grants to students pursuing higher education at four-year colleges or universities, community colleges, and career schools. The single largest source of federal grant aid for undergraduate postsecondary students is the Pell Grant program, which is authorized by Title IV of the Higher Education Act of 1965. For example, in fiscal year 2023, the Pell Grant program provided $31 billion in aid to approximately 6.5 million undergraduate students. Pell grants are need-based aid that is intended to be the foundation for all need-based student aid awarded to students. Unlike loans, students do not repay Pell Grants.

35.    States also offer grant aid to students attending postsecondary institutions. California is no different. Although other types of grants exist, California's major grant program is the Cal Grant—a state-funded, need-based program that does not need to be

repaid by students attending qualifying colleges in California. Three types exist: Cal Grant A (tuition for students pursuing a bachelor's degree at a four-year college), Cal Grant B (a living stipend in the first year, then tuition and living costs in subsequent years at community colleges or four-year universities), and Cal Grant C (tuition and training fees for students enrolled in vocational or technical programs at eligible schools).

36.    Postsecondary institutions—public, private non-profit, and private for-profit—aim to maximize free aid to reduce student debt. Yet the significant increase in the cost of postsecondary education has made loans necessary.

37.    Different types of loans are available to postsecondary students, including federal and private loans. The primary governmental student loan program that students rely on to fund their postsecondary education is the William D. Ford Federal Direct Loan program. Indeed, the U.S. Department of Education estimates that in the fiscal year 2025, it will make approximately $135 billion in new loans through the Direct Loan program.[1]

38.    The Direct Loan program, however, sets limits on the amount the student may borrow, and the cost of a student's attendance often exceeds those limits. For instance, a 2018 study that compared the cost of attendance at over 1,700 four-year colleges to federal student loan limits found that 70% of the colleges' tuition and fees exceeded undergraduate borrowing limits, at times by $11,000 or more.[2]

39.    In instances where scholarships, grants, and governmental education loans are insufficient to cover the cost of attendance, students have the option of funding

---

[1] *See* Hegji, Alexandra, Direct Loan Program Student Loans: Loan Types and Limits (2025), https://www.congress.gov/crs-product/IF12828.

[2] *See* Elyssa Kirkham, *Study: At 70% of U.S. Colleges, Tuition and Fees Are Higher Than Undergrad Loan Limits*, Jun. 25, 2018, https://www.lendingtree.com/student/us-colleges-tuition-higher-than-loan-limits-study/#:~:text=Study:%20At%2070%25%20of%20Colleges,of%20Tuition%20Exceeds%20Loan%20Limits.

the difference through private loans that are offered by third-party lenders or the institutions themselves.

40.    Institutional loans—credit extended by institutions to students to fund postsecondary education—are available at many public, private non-profit, and private for-profit institutions. For example, UC Berkeley, UCLA, UC Irvine, UC Riverside, UC San Diego, and UC Santa Cruz offer institutional loans; so do private non-profit institutions such as Chapman University and Loma Linda University.

**California extensively regulates private postsecondary institutions.**

41.    Proprietary postsecondary institutions operate within the comprehensive and strict regulatory framework of the California Private Postsecondary Education Act, Cal. Educ. Code §§ 94800, et seq. ("PPEA"), which is enforced through the broad oversight authority of the Bureau for Private Postsecondary Education ("BPPE").[3]

42.    The PPEA is sweeping; it covers nearly all facets of institutional operation. Covered institutions may operate only by obtaining approval from the BPPE. *See* Cal. Educ. Code § 94886. The BBPE evaluates financial stability, administrative capacity, educational programs, and compliance with consumer-protection mandates. *See id.* §§ 94885–94887.

43.    Institutions may lawfully operate (and maintain approval) only if they satisfy robust integrity standards, including maintaining adequate financial resources, *id.* § 94885(a)(6), employing qualified administrators and faculty, *id.* at (a)(5), preserving accurate records, *id.* at (a)(8), and supplying suitable facilities and instructional equipment. *Id.* at (a)(3).

44.    The PPEA also prescribes the manner and process by which regulated

---

[3] Notably, the PPEA exempts, among others, institutions who are accredited by the Western Association of Schools and Colleges ("WASC"). *See* Cal. Educ. Code 94874(i). Nearly all non-profit postsecondary institutions who operate in California are accredited by WASC and often seek and are granted an exemption from the BPPE. As a result, unlike their for-profit counterparts, non-profit postsecondary institutions are not subject to the BPPE's extensive regulatory oversight.

institutions enroll students. Relevantly here, CAPPS members and other institutions which are subject to the PPEA may enroll students "*solely* by means of executing an enrollment agreement," Cal. Educ. Code § 94902(a) (emphasis added). The PPEA, in turn, requires that enrollment agreements for these institutions set forth, among other things, the "total number of credit hours, clock hours, or other increment required to complete the educational program," a "schedule of total charges," and a breakdown of the total charges for the entire educational program, including the total charges that the student is obligated to pay upon enrollment. *Id.* § 94911(b), (c). The BPPE's implementing regulations imposes additional requirements that must be included in any enrollment agreement, including, but not limited to, an itemization of all institutional charges. *See* 5 Cal. Code Reg. § 71800.

45.    Once signed by the student and accepted by the institution, the enrollment agreement legally binds the student (subject to refund and cancellation provisions) to pay the cost of their education, including, but not limited to, any credit extended by the postsecondary institutions for the purpose of funding the students' cost of attendance. *See* Cal. Educ. Code § 94911(d), (k). As such, the enrollment agreements that the PPEA mandates CAPPS members use to enroll their students are in fact instruments of "education financing" as defined by the Rule.[4] *See* 10 Cal. Code Reg. § 1003(b).

46.    The practical impact of the interplay between the PPEA and the Rule upon CAPPS members and similarly-situated proprietary institutions is subtle, but significant. Per the PPEA, CAPPS members may not enroll students unless they use a PPEA-compliant enrollment agreement which is de facto an instrument of "education financing." At the same time, the Rule prohibits CAPPS members from engaging in "education financing" unless they first register with and pay fees to the Department. As a result, any CAPPS member who is unwilling or unable to register and pay fees to the Department in compliance with the Rule *will be prohibited from enrolling students*.

---

[4] "Rule," as detailed below, refers to 10 Cal. Code Reg. § 1010(a).

**COMPLAINT**

47.     The ability to enroll students is the lifeblood of all educational institutions. A law that conditions CAPPS members' ability to enroll students on their compliance with the Rule—while exempting their public and private nonprofit peer schools—improperly, unfairly, and unconstitutionally restricts CAPPS members' ability to engage in free expression and to educate their students.

48.     The PPEA reflects the Legislature's intent to safeguard students through consumer protections. It requires truthful, non-misleading advertising, Cal. Educ. Code § 94897, and mandates disclosure of program completion rates, job-placement rates, licensure exam passage rates, program costs, and institutional policies. *Id.* §§ 94909, 94910, 94912, 94912.5, 94913.

49.     The PPEA also safeguards students against financial abuse. No promissory note or educational loan is enforceable unless, at the time a student signs it, the institution has a valid BPPE approval. Cal. Educ. Code § 94917. Any time an institution extends credit, the loan document must prominently include the notice required by Cal. Educ. Code § 94916. Institutions extending credit through consumer loans must also comply with the Federal Truth in Lending Act, 15 U.S.C. §§ 1601, et seq. ("TILA"). *Id.* § 94918. TILA imposes strict disclosures to ensure borrowers understand the cost of credit and to curb deceptive practices.

50.     Students also have an entire State office to serve their interests. The Office of Student Assistance and Relief ("OSAR"), which is part of the BPPE, is entirely devoted to advancing and promoting the rights of current, prospective, and former students, including helping them navigate financial aid and consumer-loan relief mechanisms. *See* Cal. Educ. Code §§ 94949.7–94949.73.

51.     Institutions whose students receive financial aid under a federal or state aid program must also provide the BPPE with a statement of all policies, practices, and disclosures regarding financial aid. *See* 5 Cal. Code Reg. § 71190.

52.     In short, the PPEA—combined with the BPPE's broad oversight—robustly protects students attending private postsecondary institutions in California. No

1    similar comprehensive statutory framework governs public postsecondary institutions.

2        **The Department targets private for-profit postsecondary institutions for**
3        **regulation under the CCFPL, in violation of the First Amendment.**

4        53.    Concerned about the state of its financial system—an issue exacerbated
5    by the COVID-19 pandemic—California enacted the CCFPL in 2020 to protect
6    residents against unfair, deceptive, or abusive financial practices. *See* Assem. Bill 1864,
7    2019–2020 Reg. Sess. (Cal. 2020); *see also* Cal. Fin. Code § 90000.

8        54.    The CCFPL charges the Department with regulating those who are subject
9    to its reach, *id.* § 90006(a), and provides, among other things, that the Department "may
10   prescribe rules regarding registration requirements applicable to a covered person
11   engaged in the business of offering or providing a consumer financial service or product
12   . . . ." *Id.* § 90009(a)(1).

13       55.    In October 2024, the Department issued various registration rules,[5] with
14   an effective date of February 15, 2025.[6] Two rules are relevant to this lawsuit.

15       56.    The Department issued a rule ("Rule") prohibiting any person from
16   engaging in the business of offering to provide or providing subject products, including
17   education financing, to California residents without first registering with the
18   Commissioner. *See* 10 Cal. Code Reg. § 1010(a); *see also id.* § 1000(k). The
19   Department defines "education financing" as "credit extended for the purpose of
20   funding postsecondary education and the cost of attendance at a postsecondary
21   institution, including, but not limited to, tuition, fees, books, and supplies, room and
22   board, transportation, and miscellaneous personal expenses." *Id.* § 1003(b). All
23   postsecondary institutions in California—public, private non-profit and private for-
24   profit—engage in education financing as defined by the Department.

---

[5] *See* Final Text, Department of Financial Protection and Innovation,
https://dfpi.ca.gov/wp-content/uploads/2024/10/Order-Final-Text.pdf.

[6] *See* Notice of Approval of Regulatory Action, Oct. 11, 2024, https://dfpi.ca.gov/wp-content/uploads/2024/10/Notice-of-Approval-of-Regulatory-Action.pdf.

57.     However, the Department singled out private for-profit postsecondary institutions for disparate treatment. It exempted public and private non-profit institutions that offer education financing from the registration requirement (the "Exemption"), while subjecting private for-profit peers to the Rule. *Compare* 10 Cal. Code Reg. §§ 1010(a), 1000(k), 1003(b), *with id.* § 1010(b)(2).

58.     This regulation not only discriminated among postsecondary educational institutions, it was also contrary to statute. The CCFPL broadly proscribes any effort by a covered person to offer a financial product or service to a consumer that is not in conformity with the CCFPL. Cal. Fin. Code § 90003(a)(2). Postsecondary educational institutions, whether public, private non-profit or for-profit, are all "covered persons" who are subject to the plain terms of the CCFPL with respect to the arrangements through which their students pay for their respective educations. *Id.* § 90005(f). While the CCFPL contains express exemptions from its coverage and commands, no exemption covers postsecondary educational institutions of any kind. *Id.* § 90002.

59.     As explained in further detail below, the Department's Rule and Exemption violate the First Amendment.

## Relevant First Amendment Jurisprudence

60.     "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting U.S. Const., Amdt. 1.). In particular, the First Amendment strips the Commissioner and Department of the "power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).

61.     Laws that regulate or burden speech based on its content are presumptively unconstitutional and subject to strict scrutiny. *See Reed*, 576 U.S. at 163 (citing authorities); *see also Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional"). A law is content-based if it "target[s] speech based

on its communicative content"—*i.e.*, it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163, 169–71 (holding that a town code provision that restricted the posting of signs differently depending on the content of the sign was an improper content-based distinction); *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 811 (2000) (holding that a telecommunications statutory provision which distinguished between program providers and the content of the programs provided, violated the First Amendment).

62.    "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Reed*, 576 U.S. at 163–164. Even facially content neutral laws will be subject to strict scrutiny as content-based regulations if the "laws [] cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message the speech conveys[.]" *Id.* at 164 (citation omitted).

63.    Likewise, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger*, 515 U.S. at 828. "When the government targets . . . particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992)). In other words, "[v]iewpoint discrimination is [ ] an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829.

64.    Laws subject to strict scrutiny "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

65.    The First Amendment abhors content- and speaker-based restrictions on speech to such a degree that the Supreme Court has applied "heightened judicial scrutiny" even to such regulations restricting commercial speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). Commercial speech—*i.e.*, "expression related solely to

the economic interests of the speaker and its audience"—is, of course, protected under the First Amendment. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980) ("The First Amendment . . . protects commercial speech from unwarranted governmental regulation."); *see also Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) ("[S]peech does not lose its First Amendment protection because money is spent to protect it, as in a paid advertisement of one form or another.").

66.     If the government seeks to regulate commercial communications that are neither misleading nor related to unlawful activity, the government's power is "circumscribed." *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 564. Such regulation can survive scrutiny only if the State "assert[s] a substantial interest to be achieved" by the restriction on speech. *Id.* "[T]he regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal." *Id.* To demonstrate this, the State must prove that the restriction directly advances the State's identified interest. *Id.* Importantly, "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." *Id.*

<u>The Department's Rule and Exemption violate the First Amendment</u>

67.     Together, the Rule and Exemption result in an unconstitutional, content- and speaker-based restriction on speech in violation of the First Amendment. They place a significant regulatory and financial operational burden on one type of postsecondary institution—private, for-profit schools—while exempting all others.

68.     However, public and private, non-profit postsecondary institutions offer the same types of education financing as CAPPS members, and there is no legitimate basis for the Department's favoring of one over the other. Indeed, the California Legislature itself rejected such a distinction by declining to exempt any postsecondary educational institutions from the proscriptions of the CCFPL. It is therefore believed and so alleged that the regulatory distinction that the Department drew here arises solely

**COMPLAINT**

(and improperly) from a regulatory preference for public and private, non-profit institutions over private, for-profit institutions like CAPPS members, which tend to offer more vocational and career-focused training.

69.     This case is like *Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, in which the Ninth Circuit held that a licensing restriction—requiring a private postsecondary school to reject students' applications if they did not have a high school diploma or GED or had not passed a certain federal exam—was subject to heightened scrutiny because the law "*favor[ed]* particular kinds of speech and particular speakers through an extensive set of exemptions." 961 F.3d 1062, 1072 (9th Cir. 2020) (emphasis in original). As the Ninth Circuit noted, "There can be little question that vocational training is speech protected by the First Amendment." *Id*. at 1069; *see also Sorrell*, 564 U.S. at 570 ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment.").

70.     The Department's action distinguishes between speakers. Through the Exemption, the Department "picks winners and losers . . . ." *Kirchmeyer*, 961 F.3d at 1071. Public and private non-profit institutions need not register before communicating with students about education financing; private for-profit institutions—already extensively regulated under the PPEA—must first register and obtain approval. Worse yet, because the PPEA and its implementing regulations render the student enrollment agreement an instrument of education financing, the Department's challenged regulatory action effectively prohibits proprietary postsecondary institutions from enrolling students and engaging in protected First Amendment educational expression, absent registration with the Commissioner.

71.     In simple terms, the Department favors particular kinds of speech and speakers at the expense of others. Because content discrimination is apparent, heightened scrutiny applies. Whether this Court applies strict scrutiny or a special commercial-speech inquiry, the result is the same: the Department's action, at least as applied to CAPPS members that are private for-profit institutions, is unconstitutional.

*See Sorrell*, 564 U.S. at 571. Indeed, "[i]n the ordinary case, it is all but dispositive to conclude that a law is content based and . . . viewpoint discriminatory." *Id.*

72. "[I]t is the [Commissioner's] burden to justify [the Department's] content-based law as consistent with the First Amendment." *Sorrell*, 564 U.S. at 571–572. On November 17, 2021, the Department stated that registration would strengthen its ability to protect consumers through compliance examinations and reporting and would help it detect risks and understand emerging markets.[7] Those reasons do not justify the regulatory action for multiple reasons.

73. First, the Rule does not target only misleading or unlawful communications regarding education financing. *See* 10 Cal. Code Reg. § 1010(a). It prohibits all offers—including factual, lawful advertisements and promotions—unless the speaker is registered. That is an extreme and presumptively unconstitutional prior restraint. *See, e.g.*, *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) ("Any system of prior restraint . . . comes to [a c]ourt bearing a heavy presumption against its constitutional validity. . . . [A] free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." (citation omitted)). The Department could further its interests through less speech-restrictive means.

74. Second, the Exemption undermines the Department's stated goals. The Exemption's genesis was a one-page comment from a University of California representative noting federal consumer-protection requirements, including TILA, and potential resource burdens.[8] Based on that comment, the Department exempted public and private non-profit institutions, explaining only that that further study was needed to

---

[7] Invitation for Comments on Proposed Rulemaking under the California Consumer Financial Protection Law (PRO 01-21), Nov. 17, 2021, at 2, https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/11/PRO-01-21-11-17-21-Invitation-for-Comments-for-Publication.pdf.

[8] *See* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/12/University-of-California-12.20.21.pdf.

**COMPLAINT**

understand the impact on exempted institutions before requiring registration.[9]

75.    That explanation is inadequate. It does not address why private for-profit institutions are not equally, if not more, burdened by the registration mandate.

76.    It also does not address why private for-profit institutions should be subject to the Rule despite already complying with TILA and PPEA requirements when offering institutional loans—precisely the consumer-protection rationale invoked to justify the Exemption. Meanwhile, public and private non-profit postsecondary institutions, who are not subject to a regulatory framework such as the PPEA, are exempted from registration. If anything, that is the more reason why they should be subject to registration, which is what the California Legislature contemplated when it enacted the CCFPL without granting an exemption for any postsecondary institutions.

77.    Exempting approximately 300 public and private non-profit institutions does not advance, and in fact undercuts, the Department's stated interests. Because of the Exemption, most California postsecondary students who borrow money will not benefit from the Rule. *See Yim v. City of Seattle*, 63 F.4th 783, 794 (9th Cir. 2023) (quoting *Rubin v. Coors Brewing Co.*, 514, U.S. 476, 489 (1995)) ("We have observed that a [regulation] cannot meaningfully advance the government's stated interests if it contains exceptions that 'undermine and counteract' those goals."); *see also Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 824 (9th Cir. 2013) ("[U]nderinclusivity is relevant to . . . direct advancement prong because it may diminish the credibility of the government's rationale for restricting speech in the first place." (internal citation omitted)). If the Department's stated interest were truly compelling, there would be no Exemption. Indeed, the administrative record does not indicate that public and private non-profits have any better student loan outcomes than their proprietary counterparts.

78.    In short, the Department's Rule and Exemption are underinclusive,

---

[9] *See* Final Statement of Reasons, at 95, https://dfpi.ca.gov/wp-content/uploads/2024/10/Final-Statement-of-Reasons.pdf.

overbroad, and constitute a content- and speaker-based prior restraint that cannot satisfy strict scrutiny—or any heightened scrutiny—under the First Amendment.

<u>Established and Ongoing Injuries to CAPPS Members</u>

79.     CAPPS members have been, and will continue to be, damaged by the Department's regulatory action.

80.     Many CAPPS members that are private for-profit institutions have already been impacted by the Rule.

81.     Many CAPPS members who are private for-profit postsecondary institutions have been forced to register and pay non-refundable registration fees to the Department out of fear of incurring substantial penalties for noncompliance with the Department's unconstitutional mandate. On information and belief, others have been unwilling or unable to do so and now face the difficult decision to either cease enrolling students and offering education financing, or risk being penalized and sanctioned by the Department and its Commissioner.

82.     CAPPS and many of its members have also expended funds to analyze and to prepare to comply with the Rule.

**CLAIM FOR RELIEF: VIOLATION OF 42 U.S.C. § 1983**

83.     CAPPS incorporates each of the foregoing paragraphs as if restated here.

84.     At all times relevant to this action, Defendant, as Commissioner of the Department, was acting under the color of state law.

85.     Because many CAPPS members are private for-profit postsecondary institutions who offer education financing to their students, they are subject to the Department's Rule.

86.     The Rule is presumptively unconstitutional as a prior restraint and/or violates the First Amendment because it unfairly places content-based administrative and financial operational burdens on CAPPS members but not their public or private, non-profit peer institutions.

87.     The Exemption is unconstitutional because it favors the speech of public

and private non-profit institutions while censoring similar protected speech by private for-profit institutions.

88.    The Rule is also presumptively unconstitutional as a content-based restriction because it differentiates between speech about education financing (regulated) and other topics (unregulated).

89.    The Department's content- and speaker-based restrictions cannot survive strict scrutiny. They do not serve a compelling interest and are not narrowly tailored. The Exemption itself undermines the Department's asserted interests.

90.    Even under a lesser form of heightened scrutiny, the Department's action fails. It does not directly advance the Department's interests, and the discriminatory Exemption substantially undercuts those goals.

91.    As a direct and proximate result of the Department and Commissioner's regulatory action, the First and Fourteenth Amendment rights of many CAPPS members have been violated, and they have suffered harm.

92.    Unless Defendant's regulatory action and enforcement thereof is declared unconstitutional and enjoined, many CAPPS members will continue to suffer harm.

## PRAYER FOR RELIEF

As a remedies for the Department and its Commissioner's constitutional violations of the First and Fourteenth Amendment rights of CAPPS members, CAPPS respectfully requests the following relief:

A.    A declaration, pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201, that the Department's regulatory action is unconstitutional as applied to CAPPS members that are private for-profit postsecondary institutions;

B.    Entry of a permanent injunction prohibiting Defendant from enforcing the Department's regulatory action against CAPPS members who are private for-profit postsecondary institutions;

C.    A judgment holding unlawful and setting aside the Department's regulatory action as applied to CAPPS members that are private for-profit

1  postsecondary institutions, and enjoining its enforcement against those members;

2      D.    An award of attorneys' fees, costs, and expenses pursuant to 42 U.S.C. §

3  1988; and

4      E.    Such further legal and equitable relief as the Court may deem just and

5  proper.

6

7  Dated: December 15, 2025                **DUANE MORRIS LLP**

8

9                                    By:  */s/ Edward M. Cramp*
                                         Edward M. Cramp
10                                        Karen L. Alexander
                                         Ayad Mathews
11

12                                        Attorneys for Plaintiff
                                         CALIFORNIA ASSOCIATION OF
13                                        PRIVATE POSTSECONDARY
                                         SCHOOLS
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28